UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

NICHOLAS J. DEIULIIS,

                    Plaintiffs,                    20 Civ. 3252 (NRB)

          - against -                             **MEMORANDUM & ORDER**

JORDAN ENGEL, individually and d/b/a
The Decolonial Atlas, GOOD WORLDWIDE
INC., and LEO SHVEDSKY,

                    Defendants.
------------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

     In 2017, a non-profit called the CDP published a study based on a comprehensive collection of greenhouse gas emissions data that identified the top 100 fossil fuel companies responsible for carbon dioxide and methane emissions between 1988 and 2015.  One of the companies identified in the study was Consol Energy Inc. ("Old Consol"). Plaintiff Nicholas J. DeIuliis served as President and CEO of Old Consol during a portion of the period covered by the report, including its end date.

     In 2019, defendant Jordan Engel published an article on his website that sought to assign blame for climate change on the chief executives of the companies identified in the CDP report and cited to that report as its source material.  As part of his article, Engel created a map that depicted the

100 companies listed in the study alongside the name of their respective CEO, including plaintiff's name next to "Consol Energy."   Defendants Good Worldwide Inc. and Leo Shvedsky later reproduced Engel's map in their own article.   Among other things, the articles call these executives "ecocidal planet killers" and the "top 100 people killing the planet."

Although plaintiff does not deny that he was the CEO of a company that was among the top 100 contributors to greenhouse gas emissions between 1988 and 2015, he nevertheless claims in the operative first amended complaint ("FAC" or "Complaint" (ECF No. 45)) that his appearance in defendants' articles is defamatory and a false light invasion of privacy.   Plaintiff's theory rests on the premise that Old Consol changed its name in 2017 (after the end of the study period) as part of a transaction in which it spun off its coal assets to a new company that began operating under the name "Consol Energy Inc." ("New Consol").   Accordingly, plaintiff contends that the articles falsely identified him as the CEO of New Consol and thus he never should have appeared in the articles at all.

Defendants move to dismiss the Complaint on the grounds that plaintiff's inclusion in the articles is substantially true, that the challenged statements are protected expressions of opinion, and that false light invasion of

privacy is not a cause of action recognized under New York law.  (ECF Nos. 50, 54.)  For the reasons below, defendants' motions are granted.[1]

## BACKGROUND[2]

### A.    The Carbon Majors Report

In July 2017, the CDP published the 2017 Carbon Majors Report (the "Report"), which purported to track greenhouse gas emissions associated with the world's largest fossil fuel producers between 1988 and 2015 based on what it claims to be the most comprehensive database of available emissions data. The Report determined that 71% of greenhouse gas emissions from that 27-year period can be attributed to just 100 fossil fuel companies.  According to the Report, "Consol Energy Inc." ranked as the 39th, responsible for 0.5% of global industrial greenhouse gas emissions between 1988 and 2015.

Since 2011 and through and including the report's 2015 end date, plaintiff served as president of the company identified in the Report as "Consol Energy Inc.," i.e., Old

---

[1]    Defendants requested oral argument pursuant to this Court's Individual Practices § 2.I.  However, the Court declines to hear oral argument on defendants' motions given the legal bases on which the Court has resolved them, and because the Court has ruled in favor of the only parties that requested oral argument.

[2]    The following summary is taken from factual allegations contained in the Complaint and the documents incorporated by reference, including the two articles that are the subject of this action and the sources cited therein.

Consol.  In 2014, plaintiff also assumed the position as Old Consol's CEO.

**B.   Old Consol's Corporate Name Change**

In November 2017, Old Consol divested its 150-year-old coal business in a spinoff transaction.  As part of that transaction, Old Consol changed its name to "CNX Resources Corporation" and the new spinoff company, New Consol, assumed the name "Consol Energy Inc."  Although plaintiff has never been employed by New Consol, he remained as president and CEO of Old Consol (now known as CNX Resources Corporation).

While Old Consol still maintains substantial natural gas operations, plaintiff alleges that the company has significantly reduced its carbon footprint over the past decade.  (FAC ¶ 34.)  Plaintiff also alleges that he has cultivated reputations for himself and Old Consol (i.e., CNX Resources Corporation) as "innovative and environmentally-responsible leader[s] in the field of clean natural gas energy exploration and production," which plaintiff further alleges to be an important distinction amongst investors who may view natural gas as cleaner than coal and a preferable investment opportunity.  (Id. ¶¶ 9, 32, 37.)

**C.   The Engel Article**

In April 2019, Engel published an article on his internet blog, the Decolonial Atlas, entitled "Names and Locations of

the Top 100 People Killing the Planet" (the "Engel Article").
The Article cites and links[3] to the Carbon Majors Report and
features a map created by Engel that depicts the 100 companies
identified in the Report and its accompanying dataset
alongside the names of their executives (the "Map").  The Map
depicts plaintiff's name alongside "Consol Energy" in
Pittsburgh, Pennsylvania.  This is the only time plaintiff is
mentioned in the Article.



Repeating the findings of the Report, the Engel Article
begins by stating that "[j]ust 100 companies are responsible
for more than 70% of the world's greenhouse gas emissions
since 1988."  And, in assigning blame for climate change, the

---

[3]     While the Engel Article cites to the Carbon Majors Report by
name, the link is to an article about the Report published by The Guardian
that, in turn, provides a link to the Report itself.

Article labels the executives of those companies as the "100 top ecocidal planet killers" and the "top 100 people killing the planet."  The stated purpose of the Article is to "pull back th[e] veil" on these "key decision-makers" who "control the majority of the world's mineral rights – the 'right' to exploit the remaining unextracted oil, gas, and coal" and let them "know that we won't leave them alone until they agree to *Keep It In The Ground*. Not just their companies, but *them*. Now it's personal."

In September 2019, five months after the Engel Article was originally published, an addendum was added stating that a writer contacted each person on the list for an interview and found that, as of 2019, "a few CEOs have now changed." One of the changes listed in the addendum is "Console [sic] Energy – CEO James A Brock"; the Article and Map otherwise remained unchanged.

### D.   The Shvedsky Article

Three days after the Engel Article was published, Shvedsky authored an article on Good Worldwide's website entitled "These are the names and locations of the Top 100 people who are killing the planet" (the "Shvedsky Article"). The Shvedsky Article is almost entirely derivative of the Engel Article, as it reproduces the Map that Engel created and discusses the points raised in the Engel Article.  The

Shvedsky Article likewise encourages readers to "stop blaming [their] neighbors" for climate change because "even if we're making responsible decisions on the local level, we're ultimately still going to be left with a broken planet if the decision makers in positions of power at major corporations and government continue to freely pollute and cause irreparable harm to our wildlife and ecosystems." Again, the only mention of plaintiff in the Shvedsky Article is his appearance next to "Consol Energy" on the Map.

## LEGAL STANDARDS

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted to be true, to establish a right to relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

In evaluating the sufficiency of a complaint, courts must "accept[] as true all factual allegations in the complaint, and draw[] all reasonable inferences in the plaintiff's favor." Barrows v. Burwell, 777 F.3d 106, 111 (2d Cir. 2015) (citation omitted). However, we "are not bound

to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (citation omitted). Moreover, we may consider documents that are attached to the complaint, incorporated by reference in the complaint, or otherwise integral to the complaint. DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

## DISCUSSION

### I.  Defamation

We begin with plaintiff's claims for defamation and defamation per se, which are based on his appearance on the Map next to "Consol Energy," and, by extension, his inclusion among the executives whom the Articles state are "freely pollut[ing] and caus[ing] irreparable harm to our wildlife and ecosystems" and whom the Articles label as "ecocidal planet killers" and the "Top 100 People Killing the Planet." (FAC ¶¶ 3, 90-101, 107, 110, 115-24, 130, 133, 136-41, 146, 149, 153-58, 163, 166, 168-81, 186, 189, 192-205, 210, 213.) As plaintiff alleges, these claims are "premised upon" the Articles "falsely identifying him as the CEO or leader of [New Consol] and/or falsely associating him as the CEO or leader of a coal company." (E.g., id. ¶¶ 94, 117, 172, 174, 196, 198.)

A.   **Choice of Law**

Before assessing the merits of plaintiff's claims, we first address his threshold argument that the Court should apply Pennsylvania law to resolve his defamation claims.  As this case arises under our diversity jurisdiction, we apply the choice-of-law rules of the forum state, New York.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). Under New York law, the "party urging a choice of law analysis" must "demonstrate a true conflict between New York and another state's laws," otherwise courts eschew the choice-of-law analysis and apply New York law.  Dhir v. Carlyle Grp. Emp. Co., No. 16 Civ. 6378 (RJS), 2017 WL 4402566, at *4 (S.D.N.Y. Sept. 29, 2017) (citations omitted); see Portanova v. Trump Taj Mahal Assocs., 704 N.Y.S.2d 380, 383 (N.Y. App. Div. 2000).

Here, plaintiff broadly argues that Pennsylvania law should apply to all of his claims because (1) he is domiciled in Pennsylvania and damaged there and thus Pennsylvania has the most significant relationship to the case, and (2) it is particularly important to apply Pennsylvania law to his false light invasion of privacy claim, as Pennsylvania recognizes the viability of such claims alongside defamation claims whereas New York does not.  (Pl.'s Opp. Br. (ECF No. 57) at 5.)  Notably, plaintiff does not attempt to identify any

substantive differences between New York or Pennsylvania law
governing his defamation claims or cite any authority to
support any distinction.

Plaintiff's arguments fail to persuade.  First, his
contention that Pennsylvania has a more significant
relationship to this case than New York only becomes a
relevant consideration once it is established that an actual
conflict exists between the laws of the jurisdictions
involved; otherwise, it is irrelevant.  See Martin Hilti Fam.
Tr. v. Knoedler Gallery, LLC, 137 F. Supp. 3d 430, 456
(S.D.N.Y. 2015) (citations omitted).  Second, that there may
be a difference in how New York and Pennsylvania treat false
light invasion of privacy claims (which we analyze below) has
no bearing on whether Pennsylvania law should apply to
plaintiff's defamation claims.  That is because New York
follows the doctrine of dépeçage, under which the choice-of-
law analysis is conducted separately for each individual
claim.  See 2002 Lawrence R. Buchalter Alaska Tr. v.
Philadelphia Fin. Life Assur. Co., 96 F. Supp. 3d 182, 200
(S.D.N.Y. 2015) (citations omitted).

As plaintiff offers no argument for why there is conflict
between New York and Pennsylvania law as it relates to his
defamation claims, we dispense with the choice-of-law
analysis and apply New York law to those claims.  See Dhir,

2017 WL 4402566, at *4; Berwick v. New World Network Int'l, Ltd., No. 06 Civ. 2641 (JGK), 2007 WL 949767, at *6 (S.D.N.Y. Mar. 28, 2007) (applying New York law to plaintiff's defamation claims after plaintiff failed to establish a substantive conflict between New York and Pennsylvania law).

**B.   Legal Standards**

Under New York law, a defendant may be held liable for defamation when he makes "a false statement that tends to expose a person to public contempt, hatred, ridicule, aversion or disgrace." Thomas H. v. Paul B., 18 N.Y.3d 580, 584 (N.Y. 2012) (citations omitted).  To plead a claim for defamation, a plaintiff must show: "1) a written defamatory statement of fact concerning the plaintiff; 2) publication to a third party; 3) fault (either negligence or actual malice depending on the status of the libeled party); 4) falsity of the defamatory statement; and 5) special damages or per se actionability (defamatory on its face)." Celle v. Filipino Rep. Enterprises Inc., 209 F.3d 163, 176 (2d Cir. 2000) (citations omitted).

Defendants attack the statement of fact and falsity elements of plaintiff's defamation claims by arguing first, that several of the challenged statements are protected expressions of opinion, and second, that it was not false to depict plaintiff next to Consol Energy on the Map or to

include plaintiff among the executives discussed in the Articles.

### C.   Expressions of Opinion

We first consider defendants' argument that the conclusions drawn in the Articles about plaintiff and the other executives are protected expressions of opinion, including that the executives of the 100 companies responsible for over 70% of greenhouse gas emissions since 1988 are the "top 100 people killing the planet," are "ecocidal planet killers," and are "freely pollut[ing] and caus[ing] irreparable harm to our wildlife and ecosystems."

### 1.   Legal Standards

Both the First Amendment to the Federal Constitution and New York law recognize that a defendant can only be held liable for defamation based on an assertion of fact.  See Milkovich v. Lorain J. Co., 497 U.S. 1, 19-21 (1990); Brian v. Richardson, 660 N.E.2d 1126, 1129-31 (N.Y. 1995).  In evaluating whether a statement is an actionable assertion of objective fact or a protected expression of opinion, courts applying New York law look to the following three factors:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social

> context and surrounding circumstances are
> such as to signal readers or listeners
> that what is being read or heard is likely
> to be opinion, not fact.

Brian, 660 N.E.2d at 1129 (citations, alterations, and
internal quotation marks omitted).  Whether a challenged
statement constitutes an assertion of fact or an expression
of opinion is a question of law for the court to decide.  Mann
v. Abel, 10 N.Y.3d 271, 276 (N.Y. 2008).

Quintessential examples of expressions of opinion
include when an author uses "rhetorical hyperbole" or
"imaginative expression" that "cannot reasonably be
interpreted as stating actual facts," or where context
suggests that the statement is "conjecture, hypothesis, or
speculation" or otherwise "signals the reader that what is
said is opinion, not fact." Biro v. Conde Nast, 883 F. Supp.
2d 441, 460 (S.D.N.Y. 2012) (citations omitted).

An expression of opinion is fully insulated from
liability under New York law when it is either "accompanied
by a recitation of the facts upon which it is based" or "does
not imply that it is based upon undisclosed facts." Gross v.
New York Times Co., 82 N.Y.2d 146, 153-54 (N.Y. 1993); see
Chau v. Lewis, 771 F.3d 118, 129 (2d Cir. 2014) (citations
omitted).  Conversely, a statement of opinion may be
actionable if it is premised on facts that the author knew to

be false (or probably false) or otherwise implies that it is based on undisclosed defamatory facts.  See Gross, 82 N.Y.2d at 153; DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 114 (2d Cir. 2010) (citation omitted).

>    2.  **Analysis**

Here, it cannot seriously be disputed that the authors' conclusions about the executives of the 100 companies depicted on the Map——that they "freely pollute and cause irreparable harm to our wildlife and ecosystems," that they are "ecocidal planet killers," or that they are the "top 100 people killing the planet"——are anything but expressions of opinion under New York law.  The texts and contexts of the Articles establish that the challenged statements are clearly hyperbolic and are readily understood as representing the authors' subjective viewpoints, not objective assertions of fact capable of being objectively disproven.  See, e.g., Hakim v. James, 94 N.Y.S.3d 14, 16 (N.Y. App. Div. 2019) (listing plaintiff as among "100 Worst Landlords in New York City" is "nonactionable opinion").  Moreover, as the Engel Article cites to the Report as the basis for its conclusions (and the derivative Shvedsky Article does the same by linking to the Engel Article), the authors lay out the basis for their conclusions and thus these expressions of opinion are not actionable under New York law.

Plaintiff, however, contends that these opinions about him are nevertheless actionable because he claims that they are based on the supposedly false premise that his inclusion in the Article was based on mistakenly identifying him as the CEO of New Consol.  Accordingly, our analysis of whether these statements are actionable dovetails with our analysis of whether it was false for defendants to include plaintiff among the executives discussed in the Articles.

D.   **Substantial Truth**

We now turn to whether it was false to identify plaintiff as the CEO of "Consol Energy" on the Map and, by extension, include him among the executives of the 100 fossil fuel companies most responsible for greenhouse gas emissions since 1988 discussed in the Articles.

1.   **Legal Standards**

To satisfy the falsity element of a defamation claim, a plaintiff has the burden of pleading facts that establish that an allegedly defamatory statement is false or at least not "substantially true."   Tannerite Sports, LLC v. NBCUniversal News Grp., 864 F.3d 236, 242-43 (2d Cir. 2017) (citing Franklin v. Daily Holdings, Inc., 21 N.Y.S.3d 6, 12 (N.Y. App. Div. 2015)).[4]  A statement is "substantially true"

_____

[4]      Plaintiff contends that it not appropriate to resolve issues of substantial truth at the motion to dismiss stage, as that is a question reserved for the trier of fact.  The Second Circuit has conclusively

when "the overall gist or substance of the challenged statement is true," <u>Chau</u>, 771 F.3d at 129 (citation and internal quotation marks omitted), and it "would not have a different effect on the mind of the reader from that which the pleaded truth would have produced," <u>Tannerite</u>, 864 F.3d at 242-43 (citation and internal quotation marks omitted). The determination of whether a statement is substantially true turns on the "understanding of the 'average reader,'" <u>Meloff v. New York Life Ins. Co.</u>, 240 F.3d 138, 146 (2d Cir. 2001) (citations omitted), and takes into account "the entire publication, and the circumstances of its issuance," <u>Tannerite</u>, 864 F.3d at 243 (citations omitted).

### 2. Analysis

As previewed above, plaintiff's theory of falsity rests on the following premise: (1) that the Articles intended to cast blame on the CEO of New Consol and, accordingly, the company referred to as "Consol Energy" on the Map is New Consol; (2) that plaintiff was mistakenly identified on the Map as the CEO of New Consol; and (3) that plaintiff therefore

---

rejected that position and has affirmed dismissal of defamation claims when the substantial truth of the allegedly defamatory statements can be discerned based on the complaint and the documents incorporated in the complaint by reference. <u>See Tannerite</u>, 864 F.3d at 242-48 ("Because falsity is an element of New York's defamation tort, and 'falsity' refers to material not substantially true, the complaint . . . must plead facts that, if proven, would establish that the defendant's statements were not substantially true" to survive a motion to dismiss.).

never should have appeared in the Articles alongside the other executives.

Defendants argue that plaintiff's theory is facially implausible because the Map is plainly based on the Report, the Report identifies Old Consol——not New Consol——among the 100 companies most responsible for greenhouse gas emissions between 1988 and 2015, and plaintiff was CEO and president of Old Consol during the period covered by the Report, including at the end date of the study and the time of the Report's publication.  We agree.

### a.    The Genesis of the Articles and Map

We start with the basic premise advanced by plaintiff that the Map's use of "Consol Energy" must be a reference to New Consol, as that was company operating under that name in 2019.

Plaintiff's interpretation of the Articles takes a far too myopic view of the pieces, which must be assessed holistically.[5]  Both the texts and contexts of the Articles make clear that they are based on the 2017 Carbon Majors Report, which covered the period from 1988 to 2015.  To start, the Engel Article cites and links to the Report.  Moreover,

---

[5]    As the Shvedsky Article is expressly derivative of the Engel Article and links to the Engel Article, the discussion herein about the Engel Article is equally applicable to the Shvedsky Article.

the Engel Article begins by stating that "[j]ust 100 companies are responsible for more than 70% of the world's greenhouse gas emissions since 1988," which precisely captures both the findings of the Report and the timeframe studied by the Report.  Further, as defendants point out, "the Carbon Majors Report . . . identifies each of the companies named in . . . Engel's Article" (Engel Mot. (ECF No. 51) at 16), a point that plaintiff does not even attempt to dispute with respect to the 99 companies identified on the Map other than "Consol Energy."  Accordingly, it cannot seriously be disputed that the Report is the genesis of the Articles and Map.

Having established that the Articles and Map are based on the Report, we turn to whether it was false to portray plaintiff on the Map next to "Consol Energy."  Plaintiff does not dispute the findings of the Report or its identification of Old Consol as one of the 100 fossil fuel companies most responsible for greenhouse gas emissions from 1988 to 2015, the period of time covered by the Report.  Nor does plaintiff dispute that the Report's use of "Consol Energy Inc." in listing the 100 companies referred to Old Consol, the company plaintiff ran during the end of the period covered by the Report as well as at the time of the Report's publication (see FAC ¶ 22).

Given that it is beyond cavil that plaintiff was the CEO of the "Consol Energy Inc." identified in the Report during the relevant time period covered by the Report, we find that there is nothing false or defamatory about defendants placing plaintiff's name next to "Consol Energy" on the Map that is clearly based on that Report or otherwise including him among the group of executives discussed in the Articles.  That the Articles were published in 2019 does not change that they are plainly premised on the findings from the 2017 Carbon Majors Report.

### b.   Forward-Looking Statements

Plaintiff's next attempt to establish that the Articles falsely portray him as the CEO of New Consol relies on defendants' use of forward-looking statements in the Articles.  This forward-looking language, according to plaintiff, demonstrates that defendants intended to identify the "current CEOs" of the companies depicted on the Map so that they can "be targeted and pressured into making changes." (Pl.'s Opp. Br. at 2-3.)

However, none of the ostensibly forward-looking statements in the Articles even remotely suggests that it is aimed at a universe of executives other than those who run the 100 companies identified in the Carbon Majors Report. Because the Report identifies Old Consol——not New Consol——as

one of the top 100 contributors to greenhouse gas emissions since 1988 and because plaintiff continues to serve as CEO of Old Consol (FAC ¶¶ 5, 22), this theory of falsity fails as well.

### c.    The September 2019 Addendum

Plaintiff's final argument is that defendants have conceded the falsity of naming him in the Articles because an addendum was issued for the Engel Article five months after its initial publication stating that "a few CEOs have now changed," including "Console [sic] Energy – CEO James A Brock."  Plaintiff claims that addendum establishes that the Map always intended to identify New Consol and its CEO, not Old Consol and its CEO, plaintiff.  Plaintiff's argument fails on at least four levels.

First, it is illogical.  New Consol is a spinoff company that did not come into existence as a separate corporate entity until <u>after</u> the 2017 Carbon Majors Report was published.  As the Articles and Map are clearly based on the 100 companies listed in that Report and accompanying dataset, plaintiff's argument is temporally impossible.

Second, suspending that illogic, to accept plaintiff's premise would mean that defendants devised their own list of 100 companies that were the largest contributors to greenhouse gas emissions since 1988 and that these companies

coincidentally align with those named in the Carbon Majors Report with the single exception of Old Consol.  Plaintiff does not even attempt to grapple with the absurd premise that the Map just happened to identify the other 99 companies listed in the Report but somehow meant to replace Old Consol with New Consol.

Third, as the Articles explicitly seek to assign blame for climate change on the executives of the "100 companies . . . responsible for more than 70% of the world's greenhouse gas emissions since 1988," plaintiff's theory would require us to embrace the almost equally preposterous notion that New Consol, a company that became a standalone corporation only 16 months before the Articles' publication, somehow already qualified as one of those companies and that Old Consol, the 39th leading contributor to greenhouse gas emissions between 1988 and 2015 accordingly to the Report, no longer qualified.

Fourth, putting all the above aside and assuming arguendo that the addendum confirms that the Map was not based on the Report, that the Map intended to identify New Consol instead of Old Consol, and that plaintiff was therefore incorrectly identified all along as the CEO of New Consol, we would still find that his appearance in the Articles to be substantially true.  As stated above, the Articles make clear that they seek to hold accountable the "guys who run" the 100

fossil fuel companies "responsible for more than 70% of the world's greenhouse gas emissions since 1988" and to identify those executives by name.  Because that universe of companies includes Old Consol and because plaintiff admits that he is the CEO of Old Consol, it is beyond dispute that plaintiff is one of the executives that the Articles seek to hold accountable.  Accordingly, the "overall gist or substance" of the Articles with respect to plaintiff is true and not defamatory, regardless of whether the Articles account for any confusion caused by Old Consol's corporate name change.[6] Chau, 771 F.3d at 129.

At bottom, the defamatory construction of the Articles advanced by plaintiff is fundamentally inconsistent with these facts.  That is because, in plaintiff's view, the addendum establishes that Mr. Brock is and has been the CEO of the Pittsburgh, Pennsylvania-based company called "Consol Energy Inc." that was named in the Report as one of the top contributors to greenhouse gas emissions since 1988.  That, however, precisely describes plaintiff, the CEO of Old Consol, and not Mr. Brock, the CEO of New Consol.  Given the patent falsity of this interpretation offered by plaintiff,

---

[6]     It is worthwhile noting that plaintiff is at least partially responsible for the confusion caused by this corporate name change, as he was president and CEO of Old Consol when it spun off its coal assets and simultaneously permitted the spinoff company to take the exact name that Old Consol had been operating under for years.

we reject plaintiff's argument that the addendum establishes the defamatory nature of the Articles.

### E. Defamation by Implication

Because we find that the underlying premises of the Articles are substantially true, plaintiff's final refuge lies in the argument that the Articles are defamatory by implication. Here, plaintiff alleges that the Articles falsely imply that he is "a polluter" and the "CEO or leader of CONSOL and/or . . . the CEO or leader of a coal company," and that "any company he leads must be environmentally unfriendly and/or a coal industry participant." (FAC ¶¶ 94, 110, 133, 149, 166, 189, 213.)

Under New York law, to state a claim for "defamation by implication where the factual statements at issue are substantially true," a plaintiff "must make a rigorous showing that the language of the communication as a whole can be reasonably read both [1] to impart a defamatory inference and [2] to affirmatively suggest that the author intended or endorsed that inference." Stepanov v. Dow Jones & Co., 987 N.Y.S.2d 37, 44 (N.Y. App. Div. 2014). Plaintiff does not even pass the first part of this rigorous test.

As discussed exhaustively above, the underlying premise and text of Articles establish that plaintiff's depiction next to "Consol Energy" on the Map is based on his tenure as

CEO of Old Consol and thus the Articles do not reasonably imply that he is the CEO of New Consol. Nor do the Articles reasonably imply that plaintiff is the CEO of a coal company more generally, as they do not distinguish between executives of coal companies versus other fossil fuel companies. Indeed, the Engel Article explicitly lumps together executives of companies that exploit "oil, gas, and coal" resources.

Moreover, the suggestion that plaintiff is a polluter and environmentally unfriendly are opinionated conclusions that are fully supported by the findings in the cited Carbon Majors Report, which plaintiff does not dispute. That is, plaintiff was the CEO of Old Consol, a company that was a leading contributor to greenhouse gas emissions between 1988 and 2015, and remains the CEO of that company today, even after it spun off its coal assets and renamed itself CNX Resources Corporation. Accordingly, this, too, cannot support a claim for defamation by implication. And, to the extent that plaintiff argues these labels are driven solely by his association with the coal industry to the exclusion of other fossil fuels, that—again—is a distinction that the Articles and Report do not make.

Accordingly, plaintiff fails to meet the rigorous standard to state a claim for defamation by implication.

## II.  **False Light Invasion of Privacy**

Plaintiff's final claim is for false light invasion of privacy.  As discussed above, plaintiff urges us to apply Pennsylvania law to adjudicate this claim whereas defendants contend that New York law applies under New York's choice-of-law principles.

While Pennsylvania recognizes false light invasion of privacy as a viable cause of action, New York does not. Compare Graboff v. Colleran Firm, 744 F.3d 128, 136 (3d Cir. 2014) ("In Pennsylvania there can be four separate torts when there has been an invasion of privacy, one of which[ is] publicity placing a person in a false light . . . .") (citation omitted), with MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP, No. 17 Civ. 7568 (PGG), 2018 WL 4735717, at *13 (S.D.N.Y. Sept. 29, 2018) ("New York does not recognize the tort of false light invasion of privacy.") (citation omitted).

When a conflict of law arises in the context of a tort claim, New York courts apply "the law of the state with the most significant interest in the litigation." Kinsey v. New York Times Co., 991 F.3d 171, 176 (2d Cir. 2021) (citation omitted).  In conducting this jurisdictional interest analysis, courts distinguish between "conduct-regulating" and "loss-allocating" rules.  Id. (citation omitted).  Rules

governing allegedly injurious statements are considered to be conduct-regulating and thus New York courts apply the law of the jurisdiction with the more significant relationship to the parties and the tort.  See id. (citation omitted).

While the state of plaintiff's domicile typically has the most significant relationship to the case when the statement at issue was published within its borders, this consideration is not conclusive.  Id. (citation omitted). Where, as here, "an allegedly defamatory statement is published nationally, there is only a presumptive rule that the law of [the] plaintiff's domicile applies, which does not hold true . . . if with respect to the particular issue, some other state has a more significant relationship to the issue or the parties."  Id. (citation omitted).  Thus, we must evaluate whether Pennsylvania or New York has a more significant relationship to the issue or the parties.

In making that determination, New York courts "weigh all the factors that might impact on the interests of various states in the litigation" including, "where the plaintiff suffered the greatest injury"; "where the statements emanated and were broadcast"; "where the activities to which the allegedly defamatory statements refer took place"; and "the policy interests of the states whose law might apply."  Id. (citations omitted).

Applying these factors, plaintiff has established that he suffered the greatest injury in Pennsylvania where he is domiciled and where he works as CEO of Old Consol.  As pleaded, however, the injury is not exclusively confined to Pennsylvania, as plaintiff also alleges that he was damaged in part because the statements impacted his ability to attract investments in Old Consol, which is publicly traded on the New York Stock Exchange.  (See FAC ¶¶ 9, 37, 39.)  Moreover, these statements were published on the internet and, as plaintiff alleges, had an impact on a "global audience." (E.g., id. ¶¶ 142-44, 184.)  This factor, therefore, weighs only slightly in favor of applying Pennsylvania law.

Next, Engel is a domiciliary of New York and publishes his Decolonial Atlas blog from New York.  (Id. ¶ 11.)  While Good Worldwide is a domiciliary of California and Delaware, it decided to locate its major offices in Los Angeles, California and New York, New York, and its New York office "may have provided services that facilitated the creation and/or dissemination" of the Article in question.  (Id. ¶¶ 12, 16.)  Likewise, while Shvedsky is currently a domiciliary of California, he resided in New York while working as a writer for Good Worldwide.  (Id. ¶¶ 13, 17.)  Accordingly, New York (and possibly to an extent California) is where the allegedly defamatory Articles emanated from.  As for where

the Articles were broadcast, the Complaint alleges that they were published worldwide on the internet.  This factor, therefore, weighs entirely in favor of applying New York law over Pennsylvania law and obviously influenced plaintiff's decision to sue here rather than in his home state.

Third, the activities to which the statements referred, the impact of greenhouse gas emissions on the environment, are global in nature and affect both Pennsylvania and New York.  Thus, this factor does not favor application of either state's law.

Finally, while Pennsylvania has an interest in protecting its citizen from this type of tortious conduct, "New York has strong policy interests in regulating the conduct of its citizens and its media" when it comes to governing the content of publications.  Kinsey, 991 F.3d at 178 (listing cases).  As noted above, Engel operates his Decolonial Atlas blog out of New York.  And, while Good Worldwide operates primarily out of both California and New York, the Complaint alleges that the company's "presence in New York provides a strategic benefit for its business operations" and that its New York office may have helped facilitate the Shvedsky Article's publication.  (FAC ¶ 16.) Accordingly, we will follow the reasoning from Kinsey and

also join several of our sister courts in this District[7] in finding that this factor weighs in favor of applying New York law to these outlets that operate out of New York.

Under these circumstances, where plaintiff chose to sue in New York because of defendants' contacts with New York, where the statements at issues were published by media outlets that operate out of New York, and where plaintiff has alleged some harm that has a specific nexus to New York based on the alleged impact on his ability to recruit investment interest into his NYSE-traded company, we find that New York has a more significant interest in regulating the allegedly tortious conduct at issue in this case than Pennsylvania. See Kinsey, 991 F.3d at 178; Berwick, 2007 WL 949767, at *7-8 (applying New York law to determine false light claim even though plaintiff alleged some harm in his domicile of Pennsylvania because plaintiff also alleged harm to his

---

[7]    See, e.g., Kinsey v. New York Times Co., No. 18 Civ. 12345 (VSB), 2020 WL 1435141, at *5 (S.D.N.Y. Mar. 23, 2020), aff'd, 991 F.3d 171 (2d Cir. 2021) (finding that New York's "strong interest in establishing defamation standards for media outlets domiciled in the state" outweighed the policy interest of the state of plaintiff's domicile in protecting its citizens); Deaton v. Napoli, No. 17 Civ. 4592, 2019 WL 156930, at *6 (E.D.N.Y. Jan. 10, 2019); Berwick, 2007 WL 949767, at *8; Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc., No. 06 Civ. 11407 (BSJ), 2007 WL 4820968, at *5 (S.D.N.Y. Sept. 18, 2007); Weinstein v. Friedman, No. 94 Civ. 6803 (LAP), 1996 WL 137313, at *7 (S.D.N.Y. Mar. 26, 1996), aff'd, 112 F.3d 507 (2d Cir. 1996); see also Davis v. Costa-Gavras, 580 F. Supp. 1082, 1092 (S.D.N.Y. 1984) (explaining how "New York, as the national center of the publishing industry, has a significant interest in assuring that the risks and liabilities flowing from publishing and related options contracts, negotiated and largely performed here, will be uniform").

business interests in New York, the statements were published in New York, and New York has a strong interest in regulating publications originating from within its jurisdiction).

Because New York does not recognize the tort of false light invasion of privacy, plaintiff's invasion of privacy claim must be dismissed.  See Berwick, 2007 WL 949767, at *15.

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are granted and the Complaint is dismissed in its entirety with prejudice.

The Clerk of Court is respectfully directed to terminate the motions pending at ECF Nos. 50 and 54 and to close the case.

**SO ORDERED.**

Dated:    New York, New York
          September 27, 2021

_____
        NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE